Opinion
 

 SILLS, P. J.
 

 Defendants Brooklyn Navy Yard Cogeneration Partners, L.P. and Mission Energy New York, Inc., and specially appearing defendant B-41 Associates, L.P. (collectively, BNYCP) seek extraordinary relief from an order disqualifying their counsel, LeBoeuf, Lamb, Greene & MacRae, L.L.P. (LeBoeuf), for a conflict of interest. This case presents the issue (surprisingly unexplored in California case law) of whether a conflict of interest arises when an attorney represents a subsidiary corporation in one matter while undertaking a representation directly adverse to the subsidiary’s parent in another, unrelated matter. We issued an alternative writ and heard oral argument on the issue. We now grant BNYCP’s petition in part, directing the respondent court to conduct a new hearing utilizing the rules and guidelines we establish in our discussion below.
 

 I
 

 LeBoeuf has represented BNYCP since February 1991 on various matters related to the construction of a 286-megawatt cogeneration facility (the Facility) owned by BNYCP and located at the Brooklyn Navy Yard Complex in Brooklyn, New York. PMNC, a Joint Venture (PMNC) agreed to design and construct the Facility pursuant to a turnkey agreement dated
 
 *251
 
 November 1, 1994, and the Parsons Corporation (Parsons) guaranteed PMNC’s performance pursuant to a guaranty also dated November 1, 1994. (One of the three PMNC joint venturers is Parsons Main of New York, Inc.—a subsidiary of Parsons.) In the present litigation PMNC and Parsons have sued BNYCP for breach of contract and declaratory relief, raising claims concerning the parties’ respective obligations under the turnkey agreement and guaranty.
 
 [1]
 

 LeBoeuf first appeared in this action as counsel of record for BNYCP on February 20, 1997. Soon afterwards Parsons moved to disqualify LeBoeuf for a purported conflict of interest, contending that LeBoeuf, while representing parties adverse to Parsons in this litigation, is simultaneously representing Parsons’s interests in the Russian Federation (on matters concededly unrelated to this litigation). In moving for disqualification, Parsons contended LeBoeuf was violating the ethical stricture against concurrent representation of adverse interests set forth in the Rules of Professional Conduct, rule 3-310 (C)(3).
 
 [2]
 

 LeBoeuf’s representation of various Parsons subsidiaries in the Russian Federation began in March 1994 when Brian Zimbler became a partner of the firm. Zimbler had previously been a member of the law firm Graham & James where he represented the Ralph M. Parsons Company (RMP), a wholly owned Parsons subsidiary. When he joined LeBoeuf, Zimbler brought his client RMP with him. Zimbler had a conflicts check performed which revealed LeBoeuf was not representing any interests adverse to RMP. He did not check for conflicts as to RMP’s parent, Parsons. In fact, during 1993 and 1994, LeBoeuf represented BNYCP adversely to Parsons and PMNC in negotiations concerning the turnkey agreement and guaranty.
 

 In late March 1994, RMP retained LeBoeuf to represent it on various matters relating to its business interests in the Russian Federation. This representation continued from 1994 through 1996. In 1995, LeBoeuf also performed limited work for another wholly owned Parsons subsidiary acting in Russia, DeLeuw Gather International Limited. That same year, LeBoeuf assisted an affiliate of RMP, Parsons International Corporation, L.L.C.
 
 *252
 
 (PICL), in registering a branch office in the Russian Federation. In late 1996, LeBoeuf advised PICL on the application process for design and construction licensing in Russia.
 

 In January 1997, the Ralph M. Parsons Company of Delaware (RMP Delaware), a subsidiary of RMP (reorganized and renamed Parsons Process and Infrastructure), retained LeBoeuf to handle a dispute with a Russian subcontractor in connection with a military housing construction project in the Russian Federation. At the time the present lawsuit was filed, RMP Delaware’s contract dispute was the only active matter LeBoeuf was handling for any Parsons subsidiary or affiliate.
 

 The trial court granted Parsons’s motion to disqualify LeBoeuf, ruling LeBoeuf’s representation of parties adverse to Parsons created a conflict of interest. The court specifically based this ruling on its finding that “a unity of interest[s]” exists between “the current subsidiary client of the LeBoeuf firm” (RMP Delaware) and Parsons. In other words, the court concluded this unity of interests between the parent and subsidiary corporations sufficed to make Parsons a client of LeBoeuf’s for conflict purposes. BNYCP then filed a petition for writ of prohibition/mandate to challenge the disqualification order.
 

 II
 

 There are at least two crucial assumptions underlying the respondent court’s conclusion that LeBoeuf has a conflict of interest in its representation of parties adverse to Parsons. The first is that coiporate affiliation alone does not transform a corporate client’s párent into a client. The second is that where the corporate entities share a “unity of interests,” the attorney for the subsidiary must treat the parent as a client, at least for the purpose of detecting conflicts of interest.
 

 These ideas are based not on case law but rather on a formal ethics opinion issued by the California State Bar Standing Committee on Professional Responsibility and Conduct. (Cal. Compendium on Prof. Responsibility, pt. HA, State Bar Formal Opinion No. 1989-113 (State Bar Formal Opinion No. 1989-113)). There is no California case on point.
 
 [3]
 
 Given the dearth of controlling case law on the subject, we write to clarify the rules in
 
 *253
 
 this significant, high stakes area. More particularly, we write to disabuse the respondent court of the notion a general “unity of interests” between corporate entities is enough to transform a nonclient into a client. In this regard, BNYCP argues in its writ petition that the court simply misinterpreted the State Bar opinion’s discussion of the “unity of interests” concept and applied an overly broad legal standard. We agree. As explained below, we adopt the reasoning of the State Bar opinion and hold that only in those limited circumstances where one corporation is the alter ego of the other should parent and subsidiary corporations be treated as the same entity for conflict purposes.
 

 Before examining the ideas expressed in the State Bar opinion, we note that Parsons urges another ground for upholding the disqualification order, independent of the court’s “unity of interests” finding. Parsons argues the court impliedly found it was a “direct client” of LeBoeuf at the time the law firm engaged in the adverse representation. Parsons contends this implied finding is based on evidence (hotly contested) that LeBoeuf has in the past given Parsons legal advice (for example, in matters concerning which subsidiaries to register to perform work in Russia). Parsons contends such advice was given on a continuing basis and thus, under rule 1.3 of the American Bar Association, Model Rules of Professional Conduct, Parsons remained a client of LeBoeuf, having received no notice LeBoeuf was withdrawing from the representation.
 
 [4]
 

 But such a finding simply cannot be inferred from the court’s explicit ruling that LeBoeuf’s conflict exists because of the unity of interests Parsons shares with “the current subsidiary client.” The more logical inference is that the court rejected the “direct client” argument, or simply failed to rule upon it. In any event, this proposed independent ground is no basis upon which to sustain the disqualification order.
 

 Ill
 

 The question before us is whether a conflict of interest arises when an attorney accepts a representation that is adverse to the parent of an
 
 *254
 
 existing corporate client. To answer that question, we must engage in a two-step inquiry. The essential structure and substance of this inquiry are borrowed from the State Bar opinion and a concordant opinion of the American Bar Association’s Committee on Professional Ethics ABA, Formal Ethics Opinion No. 95-390 (Jan. 25,1995) (ABA Formal Ethics Opinion No. 95-390). First, we must consider whether the parent is a client or entitled to be treated as a client for conflict purposes. Second, if the parent is not a client, we must determine whether the attorney’s duty of loyalty to the subsidiary precludes a representation that is adverse to the parent.
 

 A
 

 The identity of the “client” in the context of the representation of corporations is directly addressed by rule 3-600 of the Rules of Professional Conduct. That section provides: “In representing an organization, a member shall conform his or her representation to the concept that the client is the organization itself, acting through its highest authorized officer, employee, body or constituent overseeing the particular engagement.” (Rules Prof. Conduct, rule 3-600(A).)
 

 If subsection (A) of rule 3-600 of the Rules of Professional Conduct leaves any doubt as to who or what is
 
 not
 
 a client of the organization’s attorney, subsection (D) clarifies the point. This subsection sets forth the limited nature of the duty owed by an organization’s attorney to the
 
 nonclient
 
 actors with whom the attorney deals in the corporate context. These nonclients are identified as the “organization’s directors, officers, employees, members, shareholders, or other constituents.” (Rules Prof. Conduct, rule 3-600(D).)
 

 Significantly, in regard to its identification of shareholders as nonclients, Rules of Professional Conduct rule 3-600 does not differentiate between situations where a corporation has a sole shareholder and situations where there are a multitude of shareholders. As the State Bar opinion points out, “A parent corporation, even one which owns 100 percent of the stock of a subsidiary, is still, for purposes of rule 3-600, a shareholder and constituent of the corporation.” (State Bar Formal Opn. No. 1989-113,
 
 supra,
 
 p. 2.) And thus, reasons the State Bar opinion, such a parent corporation is not a client of the subsidiary’s attorney. “Rule 3-600 makes clear that in the representation of corporations, it is the corporate entity actually represented, rather than any affiliated corporation, which is the client. The attorney owes undivided allegiance only to the corporate entity which he or she represents rather than any affiliated persons or entities. [Citation.]”
 
 (Ibid.)
 

 
 *255
 
 As to the duty an organization’s attorney owes to its shareholders and other constituents, Rules of Professional Conduct rule 3-600(D) provides only this: “[A] member shall explain the identity of the client for whom the member acts, whenever it is or becomes apparent that the organization’s interests are or may become adverse to those of the constituent(s) with whom the member is dealing. The member shall not mislead such a constituent into believing that the constituent may communicate confidential information to the member in a way that will not be used in the organization’s interest if that is or becomes adverse to the constituent.”
 

 Implicit in subsection (D) is rule 3-600’s recognition that a corporation’s interests can be adverse to those of its shareholders. The State Bar opinion points out that subsection (E) of rule 3-600 (which allows a corporation’s attorney to concurrently represent “any of its directors, officers . . . shareholders, or other constituents” only when the representation does not involve any adversity between the corporation and its constituents) further acknowledges “that a parent and subsidiary’s interests can be adverse and that circumstances can arise where each corporation needs counsel to represent it in a dispute or litigation against the other.” (State Bar Formal Opn. No. 1989-113,
 
 supra,
 
 p. 2.) Given this potential for litigation between parent and subsidiary, the State Bar opinion offers an additional, practical justification for concluding that a corporation’s attorney need not treat the affiliated entity as a client for conflict purposes. “If this committee were to opine that a parent and its subsidiary are to be treated the same for conflict purposes, it would become impossible for these corporations to retain counsel when they have disputes against each other.”
 
 (Ibid.)
 

 Like the State Bar ethics committee, we are persuaded that a corporation’s status as the parent of an attorney’s existing client does not make it a client too.
 

 B
 

 Having made the foregoing determination, we advance to step two of our inquiry: Does the attorney’s duty of loyalty to the subsidiary preclude a representation that is adverse to the parent?
 

 The duty of loyalty owed to a client is the principle underlying the rule that an attorney cannot undertake a representation which is directly adverse to an existing client. (See Rules Prof. Conduct, rule 3-310 (C); ABA Model Rules Prof. Conduct, rule 1.7 (a);
 
 Truck Ins. Exchange
 
 v.
 
 Fireman’s Fund Ins. Co., supra,
 
 6 Cal.App.4th at p. 1056.) As the California Supreme Court explained in
 
 Flatt
 
 v.
 
 Superior Court
 
 (1994) 9 Cal.4th 275 [36
 
 *256
 
 Cal.Rptr.2d 537, 885 P.2d 950], “where an attorney’s potentially conflicting representations are simultaneous .... [t]he primary value at stake ... is the attorney’s duty—and the client’s legitimate expectation—of
 
 loyalty
 
 . . . .”
 
 (Id.,
 
 at p. 284.)
 

 The ABA opinion aptly describes how this duty of loyalty may be implicated in an attorney’s representation of an interest adverse to the parent of a corporate client. “Even though the corporation against which the lawyer is considering an adverse representation is not the lawyer’s client ... the corporation that
 
 is
 
 a client may argue that the representation is nonetheless ‘directly adverse’ to it, because any potential economic impact on the affiliate entails an impact on the corporation itself.” (ABA Formal Ethics Opn. No. 95-390,
 
 supra,
 
 p. 23.)
 

 The answer to this argument is that only
 
 direct
 
 adverse consequences to an existing client are barred by either rule 3-310(C) of the Rules of Professional Conduct or rule 1.7 (a) of the American Bar Association, Model Rules of Professional Conduct. (State Bar Formal Opn. No. 1989-113,
 
 supra,
 
 p. 3.) Moreover, both the State Bar opinion and the ABA opinion agree that any negative economic consequence a corporation may suffer as a result of litigation against its affiliate is
 
 indirect
 
 rather than direct, “since its immediate impact is on the affiliate, and only derivatively upon the client.” (ABA Formal Ethics Opn. No. 95-390,
 
 supra,
 
 p. 25; see also State Bar Formal Opn. No. 1989-113,
 
 supra,
 
 p. 3.)
 

 The State Bar opinion provides two compelling policy justifications for refusing to allow such indirect adverse consequences to serve as a basis for finding a conflict of interest. The first argument is as follows: “[T]here would be no way to construct any meaningful standard to distinguish among indirect consequences. We can determine no principled basis to distinguish the facts presented here [a wholly owned subsidiary] from the situation where an attorney brings suit against a publicly-held corporation in which numerous of his or her clients may own relatively small amounts of stock. The indirect impact on the non-party client shareholders would certainly not give rise to that kind of adversity which would create a conflict of interest.” (State Bar Formal Opn. No. 1989-113,
 
 supra,
 
 p. 3.)
 

 The second policy argument is that “to conclude otherwise would create conflicts of interest which are undetectable. Banning representations adverse to entities in which existing clients own interests would make conflict screening difficult, if not impossible. While an attorney is able to determine the ownership of publicly-held corporations, making this determination for other entities or individuals may not be possible. The only way an attorney
 
 *257
 
 could determine whether there were private ownership interests would be by asking all of his or her clients for an exhaustive list of all their holdings of stock, partnership and business interests. Not only would this impose undue constraints on the attorney-client relationship, but it could also prove impossible in practice to implement.” (State Bar Formal Opn. No. 1989-113,
 
 supra,
 
 p. 3.)
 

 Once again, we are persuaded by the logic of the State Bar opinion. We conclude that the attorney’s duty of loyalty to a corporate client does not bar the attorney from representing an interest adverse to the client’s parent.
 

 C
 

 The State Bar opinion recognized a narrow exception to the rule that related corporations should not be treated as the same entity for conflict purposes. It was entitled “the alter ego exception.” In essence, the opinion noted that despite the rule that corporations are legal entities separate and distinct from their shareholders, there are some instances where, under the doctrine of alter ego, the law disregards the corporate form to avoid injustice. The opinion concluded that “[w]hen a corporation is the alter ego of another entity or has a sufficient unity of interests, they should be treated as the same entity for conflict purposes.” (State Bar Formal Opn. No. 1989-113,
 
 supra,
 
 p. 3.)
 

 In moving for the disqualification of LeBoeuf, Parsons argued this exception applied. Parsons contended it had such a unity of interests with its subsidiary RMP Delaware (LeBoeuf’s current client) that Parsons should be treated as a client too. Significantly, Parsons recharacterized the exception as the “unity of interests exception” and insisted no alter ego showing had to be made. The court agreed and declared Parsons need only establish it had a “unity of interests” with its subsidiary to achieve disqualification of LeBoeuf.
 

 The court erred in rejecting the alter ego standard in favor of a vague unity of interests test. Of course, the court may have been misled by the above quoted language from the State Bar opinion which suggests a finding of
 
 either
 
 alter ego or unity of interests would fall within the rubric of “the alter ego exception” described there. Notwithstanding the opinion’s apparent equating of the two concepts, their differences are striking.
 

 The alter ego doctrine has been extensively developed in California case law. (See generally, 9 Witkin, Summary of Cal. Law (9th ed. 1989) Corporations, §§ 12-23, pp. 524-537.) The standard expression of the showing one must make to prevail on an alter ego claim is that “(1) there is such a unity of interest that the separate personalities of the corporations no
 
 *258
 
 longer exist; and (2) inequitable results will follow if the corporate separateness is respected.
 
 (Associated Vendors, Inc.
 
 v.
 
 Oakland Meat Co.
 
 (1962) 210 Cal.App.2d 825, 836-837 [26 Cal.Rptr. 806].)”
 
 (Tomaselli
 
 v.
 
 Transamerica Ins. Co.
 
 (1994) 25 Cal.App.4th 1269, 1285 [31 Cal.Rptr.2d 433].) Case law has identified numerous factors which may be relevant to determining whether the “unity of interest” in a particular case is such that the corporations’ “separate personalities” are indeed nonexistent—the first prong of the alter ego test. These factors include inadequate capitalization, commingling of funds and other assets, disregard of corporate formalities (e.g., stock issuance, keeping of minutes, election of officers and directors, segregation of corporate records), identical equitable ownership in the two entities and identical directors and officers. (See
 
 Associated Vendors, Inc.
 
 v.
 
 Oakland Meat Co.
 
 (1962) 210 Cal.App.2d 825 838-840 [26 Cal.Rptr. 806]; and see
 
 Tomaselli
 
 v.
 
 Transamerica Ins. Co., supra,
 
 25 Cal.App.4th at p. 1285.)
 

 By contrast, the unity of interests exception adopted by the court here has no specific definition or content. All that is clear from the trial court’s application of this exception is that it entails a lesser showing than that required for a finding of alter ego. Plucked from its usual place within the alter ego test, the unity of interest concept stands shorn of its accepted meaning and limitations. Vagueness is not the only problem. The unity of interests concept is potentially so broad that an exception based on it could easily subsume the rule. After all, every subsidiary shares
 
 some
 
 unity of interest with its parent.
 

 Rather than a unity of interests exception, we conclude the alter ego exception is the test the court should have applied for the conflict alleged here. Because the scope of this exception is readily defined by existing case law, it has the important virtue of specificity. Particularly in matters of ethics, where gray areas abound, attorneys need clear rules to guide them. Moreover, an alter ego exception is consistent with the principles applied in the various steps of our analysis above. For example, given the illusoty distinction between alter egos, if one such entity is an attorney’s client, its alter ego shares the client’s expectation of loyalty from the attorney. Likewise, economic losses suffered by one alter ego will be the other’s direct losses as well.
 

 We note there is some authority for the proposition a corporation may not assert the alter ego doctrine to deny its own legal existence. As the court stated in
 
 Communist Party
 
 v.
 
 522 Valencia, Inc.
 
 (1995) 35 Cal.App.4th 980 [41 Cal.Rptr.2d 618], “[A]lter ego is used to prevent a corporation from using its statutory separate corporate form as a shield from liability only
 
 *259
 
 where to recognize its corporate status would defeat the rights and equities of third parties; it is not a doctrine that allows the persons who actually control the corporation to disregard the corporate form.”
 
 (Id.
 
 at p. 994.) Usually this position is expressed in terms of estoppel. “ ‘Parties who determine to avail themselves of the right to do business by means of the establishment of a corporate entity must assume the burdens thereof as well as the privileges.’ ”
 
 (Shapoff v. Scull
 
 (1990) 222 Cal.App.3d 1457,1470 [272 Cal.Rptr. 480], quoting from
 
 Aladdin Oil Corp.
 
 v.
 
 Perluss
 
 (1964) 230 Cal.App.2d 603, 614 [41 Cal.Rptr. 239].)
 

 On the other hand, some cases have allowed corporations to disavow the corporate form where doing so prevents injustice. (See, e.g.,
 
 In re Marriage of Imperato
 
 (1975) 45 Cal.App.3d 432, 440 [119 Cal.Rptr. 590];
 
 Cooperman
 
 v.
 
 Unemployment Ins. Appeals Bd.
 
 (1975) 49 Cal.App.3d 1, 8 [122 Cal.Rptr. 127];
 
 Mapo, Inc.
 
 v.
 
 State Bd. of Equalization
 
 (1975) 53 Cal.App.3d 245, 248-249 [125 Cal.Rptr. 727];
 
 Citizens State Bank
 
 v.
 
 Gentry
 
 (1937) 20 Cal.App.2d 415, 420 [67 P.2d 364].) In the context of an attorney disqualification motion where the value at stake is an attorney’s duty of loyalty, we believe justice is served by allowing a corporation to assert its status as the alter ego of a lawyer’s existing client. It should be remembered that the second prong of the alter ego test is that “inequitable results will follow if the corporate separateness is respected. [Citation.]"
 
 (Tomaselli
 
 v.
 
 Transamerica Ins. Co., supra,
 
 25 Cal.App.4th at p. 1285.) To estop a corporation from asserting its alter ego status and thereby tolerate an attorney’s breach of the duty of loyalty would be an inequitable result indeed.
 

 While the disqualification of counsel for a conflict of interest is a matter of trial court discretion, the exercise of that discretion cannot be measured where the court applied the wrong legal standard.
 
 (Rosenfeld Construction Co.
 
 v.
 
 Superior Court
 
 (1991) 235 Cal.App.3d 566, 576 [286 Cal.Rptr. 609].) Here, the respondent court failed to determine whether Parsons and its subsidiary RMP Delaware are alter egos. Thus, the court applied the wrong legal standard in finding LeBoeuf had a conflict of interests in undertaking a representation adverse to Parsons. We send the matter back to the respondent court to allow it to consider the motion in light of the proper standard.
 

 IV
 

 BNYCP contends as a separate ground for vacating the disqualification order that Parsons waived any conflict arising from LeBoeuf’s purported adverse representation. BNYCP argues that Parsons impliedly consented to the allegedly adverse representation because, for almost three years before
 
 *260
 
 bringing the disqualification motion, Parsons’s general counsel actually knew LeBoeuf was representing BNYCP adversely to Parsons in negotiations concerning the Facility at the same time he was approving payment of invoices for services rendered by LeBoeuf to RMP.
 

 The respondent court found no waiver on Parsons’s part. We need not reach the issue because the question of whether there was a conflict to be waived will be reconsidered below.
 

 A peremptory writ of mandate shall issue directing the superior court to vacate its ruling granting the motion to disqualify counsel and to rehear the motion, applying the legal rules and guidelines set forth in this opinion. The alternative writ is discharged and the stay is dissolved.
 

 Rylaarsdam, J., and Bedsworth, J., concurred.
 

 [1]
 

 An obvious question is why a case concerning the construction of a cogeneration facility in Brooklyn is being litigated in California. Though none of the briefs provides an answer, the complaint alleges that the principal place of business of two of the three defendants is Irvine, California.
 

 [2]
 

 Rule 3-310 (C)(3), of the Rules of Professional Conduct provides: “A member shall not, without the informed written consent of each client: fiD . . . fiD Represent a client in a matter and at the same time in a separate matter accept as a client a person or entity whose interest in the first matter is adverse to the client in the first matter.”
 

 [3]
 

 Our research revealed only one reported California decision which even touches upon the issues raised here. In
 
 Truck Ins. Exchange
 
 v.
 
 Fireman’s Fund Ins. Co.
 
 (1992) 6 Cal.App.4th 1050 [8 Cal.Rptr.2d 228], plaintiffs’ counsel was disqualified for undertaking a representation adverse to a “current client”—the defendant. Significantly, the opinion states plaintiffs’ counsel “concedes” that its representation of “an entity related to [the defendant]” in concurrent, unrelated litigation made the defendant its “client” as well.
 
 (Id.
 
 at p. 1053.) The
 
 *253
 
 opinion simply assumes the truth of this “concession” and does not analyze whether the defendant and its corporate affiliate should be treated as the same entity for conflict purposes.
 

 [4]
 

 Parsons’s argument actually rests on a comment to rule 1.3 of the American Bar Association, Model Rules of Professional Conduct which concerns “diligence.” The pertinent part of the comment is as follows: “If a lawyer has served a client over a substantial period in a variety of matters, the client sometimes may assume that the lawyer will continue to serve on a continuing basis unless the lawyer gives notice of withdrawal.” (ABA Model Rules Prof. Conduct (1983) com., 3d par., to rule 1.3.)